IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


DWAIN SMITH                                                                      PLAINTIFF

VS.                            CASE NO.  4:12-CV-268 KGB

CONWAY COUNTY, ARKANSAS,
A  Public Body Corporate and Politic,
MIKE SMITH, In His Official Capacity
as Sheriff for Conway County, Arkansas,
RICK EMERSON,  In His Individual and Official
Capacity as Jail Administrator for Conway
County Detention Center, JACOB ZULPO,
In His Individual and Official Capacity as Jailer
for the Conway County Detention Center,
and JANSEN CHOATE, In His Individual
and Official Capacity as Jailer for the
Conway County Detention Center                              DEFENDANTS

<u>PLAINTIFF'S BRIEF IN OPPOSITION TO THE
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>[1]


<u>Introduction</u>

       This is a cause of action seeking to redress the constitutional deprivations sustained by the

plaintiff **Dwain Smith**, which occurred on February 28, 2012, in Conway County, Arkansas, in the

City of Morrilton.  This cause of action seeks to recover damages suffered by the plaintiff due to

being subjected to an unreasonable seizure of his persons by being subjected to excessive force,

deprivation of his right of liberty without due process of law while being subjected to an unlawful

seizure, in violation of his rights as secured by the Fourth, Fifth, Eighth, and Fourteenth

---

[1]The plaintiff adopts by reference and incorporates herein as if set out word for word, his Brief in Support of his *Motion for Summary Judgment* filed on July 30, 2013. [**Doc. # 24**].  The Court is also requested to review the exhibits that were attached to the *Plaintiff's Motion for Summary Judgment*, *Plaintiff's Brief in Support*, and *Plaintiff's Statement of Undisputed Facts*.

Amendments to the United States Constitution as well as 42 U.S.C.S. § 1983.  This is also an action

seeking declaratory relief pursuant to 28 U.S.C. § 2201 to declare the rights and other relations

between the parties and for damages and injunctive relief on behalf of the plaintiff against the

defendants as specified more fully below.

<u>Statement of Facts</u>

On February 28, 2012, the plaintiff Dwain Smith, was arrested for delivery of a controlled

substance (Hydrocodone), by members of the Morrilton Police Department.  (**See Deposition of**

**Dwain Smith attached herein as Plaintiff's Exhibit "A", p. 6**) (**See also Copy of Bench Warrant**

**attached herein as Plaintiff's Exhibit "B"**).  Mr. Smith was arrested at his house by members of

the Morrilton Police Department on February 28, 2012.  (**Smith's depo., p. 6**).  Mr. Smith is a

Vietnam Veteran, who suffers from posttraumatic stress, chronic back pain, and pain in the knees.

At the time of Mr. Smith's arrest, he informed the arresting officers about his medical condition, for

which there was no response.  (**Smith's depo., p. 7**).

Mr. Smith was taken to the Conway County Detention Facility, located in Morrilton,

Arkansas, where he had previously been housed on two (2) separate occasions.  Mr. Smith informed

the jail staff about his medical condition.  (**Smith's depo., p. 8**).  At the time of plaintiff's arrest, he

was on the following medications: *Hydrocodone* -7.5 mg., *Meloxicam* - 15 mg., *Polyethyleneclycol*,

*Sildenafil citrate* - 100 mg., *Terazosin* - 10 mg., *Tizanidine* - 4 mg., *Tramadol* - 50 mg.   (**Smith's**

**depo., p. 9**).  The plaintiff was arrested at 9:15 a.m., and had not taken his daily medications.  The

plaintiff had no alcohol within twenty-four (24) hours of his arrest.  Mr. Smith was booked in at the

jail, and placed in a cell with other inmates. (**Smith's depo., p. 11**).

During the time period between 9:15 a.m. to 5:15 p.m., on the date of February 28, 2012,

while Mr. Smith was incarcerated at the Conway County Detention Facility, the plaintiff just laid around.  Mr. Smith was not allowed to make any phone calls, despite requesting to do so.  Mr. Smith spoke with Denise [Gregory], who at the time was the shift commander.  (**Smith's depo., p. 13**) (**See also Defendant's Responses to the Plaintiff's First Set of Interrogatories and Requests for Production of Documents attached herein as Plaintiff's Exhibit "C"**, **Response to Interrogatory No. 5**).  At approximately 5:15 p.m., on the date of February 28, 2012, Mr. Smith spoke with Denise Gregory, *via* the intercom system, stating that he was in pain, and that he needed his medication.  (**Smith's depo., pp. 12, 14**).  Mr. Smith requested to be allowed to go to the emergency room, due to his severe back pain and migraine headaches.  Ms. Gregory spoke with Rick Emerson, who at the time was the jail administrator, who advised Ms. Gregory that Mr. Smith was not to be taken to the emergency room.  (**Smith's depo., p. 14**) (**Plaintiff's Exhibit "C", Response to Interrogatory No. 5**).  Ms. Gregory advised Jailer Jansen Choate to inform Mr. Smith that he was not going to the emergency room.  Ms. Gregory also advised Mr. Choate to have Mr. Smith brought to the front of the jail, where he could be observed. (**Plaintiff's Exhibit "C", Response to Interrogatory No. 5**).

Mr. Smith spoke with Denise Gregory *via* the intercom system, advising her that he was in pain, in need of medical attention, but was told that there was nothing that she could do.  Ms. Gregory advised the plaintiff to fill out a medical complaint, and that he should call someone at home to bring his medication.  The plaintiff advised Ms. Gregory that there was no one that he could call. (**Smith's depo., p. 15**).   Mr. Smith continued to call on the intercom system, but no one responded.  (**Smith's depo., p. 20**).

Jansen Choate is employed by the Conway County Detention Facility.  Mr. Choate started his employment with the Conway County Detention Facility on January 28, 2010. Prior to working

for Conway County, Mr. Choate was employed by Wendy's Restaurant.  (**See Deposition of Jansen Choate attached herein as Plaintiff's Exhibit "D", p. 6**).  Mr. Choate was trained on Jail Standards when he became employed by Conway County Detention Facility.  The class lasted for one (1) week. (**Choate's depo., p. 7**).  During the administration of Rick Emerson, who served as the Jail Administrator, there were postings in the Conway County Detention Facility that warned inmates that they were subject to being tased if they failed to comply with any orders of the jailers. However, when Cheryl Eoff became the new jail administrator, those postings were removed, because this was not her policy. (**Choate's depo., p. 8**).

Jail Administrator Emerson had a low tolerance for inmates' noncompliance.  Mr. Emerson's policy allowed jailers to tase any inmates who refused to obey the jailer's orders. Under Ms. Eoff's policy, the jailers were required to use diplomacy to defuse any situation, rather than going straight for the taser.  Again, under the policy of Jail Administrator Rick Emerson, postings were placed in the jail, warning inmates that they would be tased should they failed to comply with any orders of the jailers.  (**Choate's depo., 10**).  Rick Emerson repeatedly told jailers that if an inmate was not complying with their orders, then they were allowed to use the taser to force compliance with their orders.  (**See Deposition of Jacob Zulpo, attached herein as Plaintiff's Exhibit "E", p. 11**).

Jacob Zulpo started working for Conway County Detention Facility as a jailer in June 2012. Upon Mr. Zulpo's employment, he received no training by Conway County, Arkansas.  (**Zulpo's depo., p. 9**).  Prior to February 28, 2012, Mr. Zulpo had received no training on the use of the Taser. (**Zulpo's depo., pp. 10-11**).  Jail Administrator Rick Emerson told Mr. Zulpo that if he needed a Taser, just to get one and use it.  Mr. Emerson told Mr. Zulpo and the other jailers to use the Taser for the safety of the officer, and for compliance.  There were signs posted in the jail warning inmates

that if they refuse to comply with orders, they were subject to being tased.  (**Zulpo's depo., p. 11**).  Mr. Emerson told Mr. Zulpo and the other jailers that they were free to use the taser in order to get an inmate to comply.  (**Zulpo's depo., 12**).

On the date of February 28, 2012, Mr. Zulpo started his shift at 4:00 p.m., and had been out on transport.  Mr. Zulpo returned at 7:45 p.m. to 8:00 p.m..  When Mr. Zulpo got back to the jail, he spoke with Rick Emerson, who told him that under no circumstance, were he to take Mr. Smith to the emergency room. Ms. Denise had been on the telephone with Mr. Emerson, and had advised him that Mr. Smith had been complaining about being in pain, and was wanting to go to the hospital. (**Zulpo's depo., p. 20**).  Mr. Smith had originally been housed in "D" Block on the date of February 28, 2012.  Mr. Smith advised Ms. Gregory that he was in pain, and was needing his medication.  Mr. Smith was then moved to "A" Block, to keep him from hurting himself and others.  Mr. Choate first met Mr. Smith at 6:00 p.m., on the evening of February 28, 2012.  (**Choate's depo., p. 27**). Mr. Zulpo and Mr. Choate moved Mr. Smith from "D" Block to "A" Block, which was just two (2) doors down.  Mr. Smith was fully complying.  (**Choate's depo., p. 28**).  Mr. Smith was in "A" Block alone.  This cell block consists of two (2) cells upstairs and two (2) cells downstairs.  They were renovating "A" Block at the time, which was not in use.  (**Choate's depo., p. 32**).

A few hours after placing Mr. Smith in "A" Block, inmates got in the intercom, stating that a man was yelling for help.  Mr. Choate could not hear Mr. Smith.  When Mr. Choate went to the back, he could hear Mr. Smith yelling that he was in pain, and in need of medical attention.  Mr. Choate asked Mr. Smith to calm down, and wait for five (5) minutes, to allow him to go back up front to speak with a supervisor. (**Choate's depo., p. 29**).  Mr. Choate then spoke with Rick Emerson, telling him that Mr. Smith was in pain, and requesting to be taken to the emergency room.

Mr. Emerson told Mr. Choate that Mr. Smith was not going to the emergency room, and that he had

to wait until the morning to see the doctor.  When Zulpo returned to the jail, he spoke with Mr.

Emerson, who told Zulpo and Choate to bring Mr. Smith to the front where he could be observed.

Mr. Emerson did not want Mr. Smith taken to the hospital, because the county would be responsible

for the bill. (**Choate's depo., p. 30**).

Choate and Zulpo went to the back to get Mr. Smith out of "A" Block, and have him

transferred to the front, pursuant to Emerson's instructions. Mr. Smith was yelling that he was in

pain, and needed to be taken to the emergency room.  Choate and Zulpo told Mr. Smith that there

was nothing that they could do, that he was not going to the hospital, and that he needed to get his

stuff in order to be moved to the front.  When Choate and Zulpo went into Mr. Smith's cell, he was

lying down, rocking back and forth, moaning.  (**Choate's depo., p. 33**) (**Zulpo's depo., p. 24**) (**See**

**also Written Statement of Zulpo attached herein as Plaintiff's Exhibit "F", and the Written**

**Statement of Choate attached herein as Plaintiff's Exhibit "G"**).  Mr. Zulpo advised Mr. Smith

that he needed to calm down, and that he was not going to the hospital.  (**Zulpo's depo., p. 24**).  Mr.

Zulpo then applied a PPCT pressure point to the back of Mr. Smith's ear, attempting to get him to

calm down, and at that point Mr. Smith retreats back into his bunk, against the wall, moving further

away from Zulpo and Choate. (**Zulpo's depo., p. 25**) (**Choate's depo., p. 33**).

Mr. Zulpo advised Mr. Smith that he needed to calm down, and get up from his bunk, or he

will be tased.  (**Choate's depo., p. 34**).  Mr. Smith advised Zulpo that he cannot get up, due to the

pain that he was in.  Mr. Zulpo insists that there is nothing wrong with Mr. Smith, and that he must

comply by getting up and getting his stuff.  Mr. Smith again advises Mr. Zulpo that he cannot move,

and that he cannot get up.  At this point Mr. Smith was tased by Zulpo. Mr. Zulpo again told Mr.

Smith that he needed to get up, or he would be tased again.  As Mr. Smith was attempting to sit up, he was tased a second time, with Zulpo saying, "we can do this all night."  The tasering caused Mr. Smith to fall to the floor.  (**Smith's depo., p. 21**).

After Mr. Smith was tased the first time, he was lying on this bunk, with the probes still in him.  Mr. Zulpo is telling Mr. Smith that he need to get up, and comply with their orders, but Mr. Smith is saying that he cannot get up.  Zulpo tells Mr. Smith that he needs to get up on his own, and that they cannot help him get up, again Mr. Smith is saying that he cannot get up.  Mr. Zulpo then tells Mr. Smith that he has to get up or else, which was a warning.  When Mr. Smith did not get up, he was tased a second time, causing  Mr. Smith to fall to the floor.  (**Choate's depo., p. 35**).  Before Mr. Smith was tased the second time, he was lying on his bunk, stating that he could not get up.  Mr. Zulpo told Mr. Smith that he had three (3) seconds to get up.  Mr. Zulpo started counting down, three, two, one, and when Mr. Smith did not get up, he was tased a second time. (**Choate's depo., p. 37**).  Mr. Smith was crying, stating that he could not get up.  Mr. Smith asked for the jailers' help in getting up, but was told that he had to do it on his own.  During the tasering process, Mr. Smith accidently kicked Mr. Zulpo.  (**Choate's depo., p. 38**).

The tasering process is a five (5) second cycle.  When Mr. Smith was tased the first time, he laid back down in his bunk, and backed up.  The Taser probes hit Mr. Smith in his chest. (**Zulpo's depo., pp. 30-31**).   At the time that Mr. Smith was tased, he was not wearing a shirt.  (**Smith's depo., p. 24**).   After Mr. Smith was tased the second time[2], he was able to make it to his feet, and pick up his mat, and walk to the front of the jail. (**Smith's depo., p. 26**) (**Choate's depo., 39**).

---

[2]Mr. Smith contends that he was tased three (3) times.  For purposes of this motion for summary judgment, the plaintiff will concede that he was tased twice.

Statement of Law

A.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (FRCP), a movant is entitled to

an order granting summary judgment when there is no genuine issue as to any material fact.

> Summary judgment can properly be entered when there are no genuine material facts
> that can be resolved by a finder of fact; that is, there are no facts which could
> reasonably be resolved in favor of either party.  The court must determine 'whether
> the evidence presents a sufficient disagreement to require submission to a jury or
> whether it is so one-sided that one party must prevail as a matter of law.'

Twin City Bank, et al. v. Verex Assurance, Inc., 733 F.Supp. 67 (E. D. Ark. 1990), *citing*, Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).   "On summary

judgment, the question before the district court, and this court on appeal, is whether the record, when

viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."  Strate v.

Midwest Bankcentre, Inc., United States Eighth Circuit Court of Appeals, No. 03-4039 (February

17, 2005), *citing* Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

"Summary judgment should be 'cautiously invoked' so that no person will be improperly

deprived of his Seventh Amendment right to a jury trial where there is no genuine issue as to any

material fact."   Robertson v. White, 635 F.Supp. 851, 870 (W.D. Ark. 1986).  The Eighth Circuit

has also held that "a judge does not sit as a trier of fact when deciding a motion for summary

judgment even if the case is scheduled to be heard without a jury."  Medical Institute of Minnesota

v. Nalts, 817 F.2d 1310 (8th Cir. 1987).

The moving party has the burden of demonstrating that there is no genuine issue as to any

-8-

material fact, and any doubt should be resolved in favor of the party resisting the motion.  Ozark

Milling Co., Inc. v. Allied Mills, Inc., 480 F.2d 1014 (8th Cir. 1973).  The courts have held that since

summary judgment is such an extreme remedy, a motion for summary judgment should be granted

"only if no genuine issue exists as to any material fact."  Haas v. Weiner, 765 F.2d 123 (8th Cir.

1985).  "In deciding whether to grant a motion for summary judgment, the district court must view

the evidence in favor of the party opposing the motion and give him the benefit of all reasonable

inferences."  Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990); Kegel v.

Runnels, 793 F.2d 924, 926 (8th Cir. 1986); Johnson v. Minnesota Historical Society, 931 F.2d

1239, 1244 (8th Cir. 1991); Canada v. Union Electric Company, 135 F.3d 1211, 1212 (8th Cir.

1997).   Affidavits are not necessary to oppose a motion for summary judgment.  *See* Adams d/b/a

D. L. Adams Motors v. Hudspeth Motors, Inc., 587 S.W.2d 227 (Ark.App. 1979).

> Fed.R.Civ.P. 56(c) provides that summary judgment shall be entered if the
> `pleadings, depositions, answers to interrogatories, and admissions on file together
> with the affidavits, *if any*, show that there is not a genuine issue as to any material
> fact and that the moving party is entitled to a judgment as a matter of law.'

Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990) (emphasis added).

"Summary judgment should be sparingly used and then only in those rare instances where

there is no dispute of fact and where there exists only one conclusion.  All the evidence must point

one way and be susceptible of no reasonable inferences sustaining the position of the non-moving

party."  Holly v. Sanyo Mfg. Inc., 771 F.2d 1161, 1164 (8th Cir. 1985).

In the case at bar, Conway County Detention Facility has a policy and practice of allowing

its detention officers to tase individuals who fail to comply with an order.  The evidence clearly

demonstrates that Mr. Smith was tased simply because he did not get out of his bunk, when ordered

to do so.  Mr. Smith was lying down in his bunk, moaning and groaning in pain, due to his physical condition.   There was no need to use a Taser on Mr. Smith, who was simply lying in his bed, requesting medical attention.   "In turn, '[t]he reasonableness of a particular use of force depends on the circumstances of each case, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010), *quoting*, Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. . 1865).

In *Shannon*, supra., the plaintiff was the owner of a drinking establishment.   Timothy Shannon was drinking heavily on the night of September 12, 2006.  Mr. Shannon got into a fight with two (2) females, who came to take him home.  Officer Michael Koehler responded to a 911 call. When Officer Koehler responded, Timothy Shannon met him at the door, and told him that he was not needed.  Mr. Shannon was using profanity towards Officer Koehler, telling him to get out, and at one point, Mr. Shannon poked Officer Koehler in his chest with his finger, which Shannon denies. Officer Koehler contends that Shannon poked him in the chest a second time, again a point denied by Mr. Shannon.  At that point, Officer Koehler did a take down of Mr. Shannon, causing severe injuries to him.   "Although Shannon greeted Officer Koehler in a disrespectful, even churlish manner, that alone did not make Officer Koehler's use of force acceptable under extant law.  *See Bauer*, 713 F.2d at 412 ('[T]he use of any force by officers simply because a suspect is argumentative, contentious, or vituperative' is not to be condoned.'" Shannon v. Koehler, 616 F.3d 855, 865 (8th Cir. 2010).   The Court affirmed  the trial court's decision in refusing to grant Officer Koehler's motion for summary judgment, holding that Shannon had created a genuine issue of

material fact as to whether he was subjected to excessive force.

When Jailers Zulpo and Choate went into the cell of Mr. Smith, Choate was armed with an Advanced Taser M26.  (**See Taser Use of Force Report attached herein as Plaintiff's Exhibit "H"**).  All Tasers are called Electronic Control Devices (ECD).  "ECDs are designed in probe-deployment mode to temporarily incapacitate a person from a safer distance than some other force options."  (**See Taser Manual attached herein as Plaintiff's Exhibit "I"**).  The Advanced Taser M26 has a cartridge that is attached to it, that shoots out projectiles, that are attached to wires, which are 21 feet in length.  The projectiles are metal barbs, that can best be described as straighten fish hooks.  Once the TASER fires the barbs, the suspect gets a preset voltage of electricity, which is five (5) seconds.    There is a voltage of 50,000 volts that is emitted from the TASER M26.  Once the person is Tased, they become incapacitated, and cannot move.  According to TASER International:

> [t]he TASER X26 uses a replaceable cartridge containing compressed nitrogen to deploy two small probes that are attached to the TASER X26 by insulated conductive wires.  The TASER X26 transmits powerful electrical pulses along the wires and into the body affecting the sensory and motor functions of the peripheral nervous system.  The energy can penetrate up to two inches of clothing.

(**See Plaintiff's Exhibit "I", pp. 3-4**).

In that the electrical current can penetrate up to two (2) inches of clothing, it is not necessary for the barbs to penetrate a person's skin, in order for them to receive the effects of being Tased.  However, in the case at bar, Mr. Smith did not have a shirt on, and was tased in his chest.  (**Smith's depo., p. 24**).

Taser International warns about the dangers of tasering.  "The TASER probe has a small dart point which may cause a penetration injury to a blood vessel or internal organ (including lung, bone, or nerve).  The probe or dart point (which may detach) can also puncture or become embedded into

a bone, or tissue, which may require immediate medical attention, surgical removal, or may result in scarring, infection, or other serious injury." (**Taser Training Manual, page 5 of 6**).

Despite these warnings, it is the policy, custom, and practice of the Conway County Detention Facility to allow its officers to use the Taser as a tool to force compliance. Rick Emerson repeatedly told his jailers that they were free to use the Taser to force inmates to comply with orders. (**Zulpo's depo, p. 11**). An inmate (Charles Burnett) was brought into the jail by Jailers Brown and Choate, on February 14, 2012. The inmate, who was handcuffed behind his back, was led into the cell, and told to get on his knees and face the wall, to which he complied. Officers Choate and Brown, who were near the cell door, took the handcuffs off Mr. Burnett, who immediately stood, facing the wall. The jailers told Mr. Burnett several times, to get back on his knees, which he refused. Although it was safe for the jailers to exit the cell, Choate decided to tase Mr. Burnett, simply because he refused to get back on his knees. At the time of tasering Mr. Burnett, the officers had completed their work with Mr. Burnett, and there was no need for them to remain in the cell with him. Nevertheless, Choate tased Mr. Burnett, because he simply refused to get back on his knees. (**Choate's depo, pp. 23-26**) (**See Tasering Report of Inmate Burnett attached herein as Plaintiff's Exhibit "J-1"**) (**See also Jailer's Incident Report - "J-2"**) .

The evidence is also clear that jailers were free to use the Taser device as a method of punishing inmates. On February 3, 2012, at approximately 8:29 p.m., an inmate by the name of Jacob Battle approached Mr. Choate, telling him that his head was hurting like a "bitch." Mr. Choate then remarked that Mr. Battle looked like a "bitch." At which point, Mr. Battle became offended, and slapped Mr. Choate. Mr. Choate then reached for his Taser, in an effort to tase Mr. Battle, but did not have it on him at the time. (**Choate's depo., pp. 12-13**) (**See Jailer's Incident**

**Report attached herein as Plaintiff's Exhibit "K"**).  Mr. Choate told Mr. Battle to get his stuff,

because he was being placed on lock down.  (**Choate's depo., p. 14**).  Less than an hour later, Mr.

Choate went to "A" Block, where Mr. Battle had been on lock down, in order to remove a previously

drunk inmate.  This time Mr. Choate was armed with his Taser.  While in the cell, removing the

inmate, Mr. Choate told Mr. Battle that he had better never raise his hand to him again, or come at

him in an aggressive manner again.  Mr. Battle then came towards Mr. Choate, who then pulled out

his Taser and tased Mr. Battle two (2) times. (**See Jailer's Incident Report attached herein as**

**Plaintiff's Exhibit "K-1"**).  Mr. Choate told Mr. Emerson about the matter, who advise Mr. Choate

that he was justified in the use of force against Mr. Battle.  (**Choate's depo., pp. 15-17, 19-21**).  Mr.

Choate was upset over getting slapped by Mr. Battle.  When he decided to re-enter the cell about an

hour later, he had his Taser, obviously hoping to provoke Mr. Battle, which is exactly what

happened. (**Choate's depo., p. 16**) (**See also the Taser Report by Jansen Choate attached herein**

**as Plaintiff's Exhibit "K-2"**).

> This court has held that where a § 1983 claim is based on a municipality's alleged
> failure to prevent misconduct by its employees, the city is liable only where
> municipal officials can be shown to be directly responsible for the improper actions
> of their subordinates.  *Wilson v. City of North Little Rock*, 801 F.2d 316, 322 (8th Cir.
> 1986) (*Wilson*).  The claimant must demonstrate 'deliberate indifference or tacit
> authorization [by municipal officials] of the offensive acts by [failure] to take
> remedial steps following notice of a pattern of such acts by . . . subordinates.' *Id*.
> Thus, to prove her case, Harris had to show that City officials had notice of prior
> incidents of police misconduct and had deliberately failed to act on this knowledge.

Harris v. City of Pagedale, 821 F.2d 499 (8th Cir. 1987).

        42 U.S.C.S. § 1983

The plaintiff is bringing this action for the purpose of obtaining relief pursuant to 42 U.S.C.

§ 1983 due to the defendants violating his rights a guaranteed by the Fourth, Fifth, Eighth, and

Fourteenth Amendments to the United States Constitution.  The language of 42 U.S.C. § 1983 reads as follows:

> Every person who, under color  of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is well established that 42 U.S.C. § 1983 is an enforcement provision for violations of a citizen's individual rights as guaranteed by the Fourteenth Amendment of the United States Constitution.  A bill introduced in the House of Representatives on March 28, 1871 as H.R. 320 (which is codified as 42 U.S.C. § 1983), known as the Civil Rights Act of 1871, was introduced as "a bill 'to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.'" Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "The history of the Act (Civil Rights Act of 1871) is replete with statements indicating that Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982).

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).  The Court went on to note that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'state action' requirement of the Fourteenth Amendment are identical." 457 U.S. at 929.  The key language in § 1983 for the case at

bar is "custom or usage."

> [T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to government 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.

Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In another United States Supreme Court decision, the Court recognized that the official policy need not be a written policy, the Court held, "[a]lthough not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a custom or usage' with the force of law." Adickes v. S.H. Kress and Company, 398 U.S. 144, 90 S.Ct. 1598, 1613-1614 (1970). The Court cited a decision by Justice Frankfurter, who wrote:

> [I]t would be a narrow conception of jurisprudence to confine the notion of laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settle state practice . . . can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher than the dead words in the written text. 90 S.Ct. at 1614, citing Nashville, C. & St. Louis Rail Company v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed 1254 (1940).

The Fourteenth Amendment to the United States Constitution made the bill of rights applicable to state action. Basically, States are prohibited from abridging the privileges or immunities of its individual citizens. In dealing with the issue of what are privileges and immunities of individual citizens, the United States Supreme Court cited an opinion by Mr. Justice Washington of the Circuit Court for the District of Pennsylvania enunciated in the case of Corfield v. Coryell. Mr. Justice Washington noted that the privileges and immunities of citizens are fundamental rights.

Justice Washington wrote that "'[w]hat these fundamental principals are, it would be more tedious than difficult to enumerate.  They may all, however, be comprehended under the following general heads:  protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole.'"  <u>Slaughter-House Cases</u>, 16 Wall. 36, 21 L.Ed. 394 (1873).   Also, the Fourteenth Amendment guarantees citizens of the United States equal protection of the laws.

    B.    <u>Excessive Force</u>

The Fourth Amendment to the United States Constitution protects citizens from unreasonable seizures by the government.  The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secured in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

<u>Foster v. Metropolitan Airport Commission</u>, 914 F.2d 1076 (8th Cir. 1990).

Charles Wayne Foster dropped his wife off at the airport, and parked in a no parking zone. Officer Andrew Baetz, advised Mr. Foster that he could not park there, and advised that he had to move his vehicle.  Officer Baetz asked Foster on three (3) separate occasions to move his car.  When the officer returned and saw that Foster had not moved his car, the officer gave Foster a ticket, which Foster immediately tore up.  Foster was told that he was under arrest, and responded by rolling up his windows.  Other officers arrived, and forcibly removed Foster from his car.  Foster contends that as the officers were taking him to a holding area, they shoved him into the elevator and wall, causing him injuries.

The Supreme Court has made it clear that 'all claims that law enforcement officers
have used excessive force . . . in the course of an arrest . . . of a free citizen should
be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather
than under a 'substantive due process' approach.' *Graham v. Connor*, 490 U.S. 386,
109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (emphasis in original).  The question
for the jury is whether, judging from the perspective of a reasonable officer at the
scene of the arrest, the totality of the circumstances justifies the use of the force use.
*Id*. 109 S.Ct. at 1872.  Circumstances such as the severity of the crime, whether the
suspected posed a threat to the safety of the officers or others, and whether the
suspect was resisting arrest are all relevant to the reasonableness of the officer's
conduct. *Id*.  'Not every push or shove, even if it may later seem unnecessary in the
peace of a judge's chambers,' violates the Fourth Amendment.' *Id* (quoting *Johnson
v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert denied*, 414 U.S. 1033, 94 S.Ct. 462, 38
L.Ed.2d 324 (1973)).

914 F.2d at 1081-1082.

"A plaintiff may recover for excessive use of force under § 1983 if the degree of force was

unreasonable under the circumstances, or if the force was used for an improper purpose." Patzner

v. Burkett, 779 F.2d 1363 (8th Cir. 1985), *citing* Bauer v. Norris, 713 F.2d 408, 411-12 (8th Cir.

1983).   In *Patzner*, the plaintiff was involved in an automobile accident, while intoxicated.  The

plaintiff then told the other driver, that he was going home, and he left the scene.  When the officers

arrived, the other driver told them that the Patzner left, and that he appeared to have been

intoxicated.  The officers then drove to the plaintiff's home, and after entering his home, told him

that he was under arrest, and that he needed to come to the police station.  Patzner told the officers

that he was not going any where with them.   The officers placed handcuffs on Patzner, and

proceeded to drag him out of the house, and placed him in the squad car.  Patzner, who was a

Vietnam veteran, had lost both legs during the war.   Upon arriving at the police station, the officers

then drug Patzner from the squad car, up the stairs to the police station.  Although Patzner was

uncooperative at first, he states that he agreed to go with the officers, after he was pulled from his

-17-

wheel chair; however, the officers ignored him.  The Eighth Circuit held that the officers were

unjustified in entering the home of Patzner, without a warrant.  "[P]hysical entry of the home is the

chief evil against which th wording of the Fourth Amendment is directed." Patzner v. Burkett, 779

F.2d 1363 (8th Cir. 1985), *citing*, Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 2100, 80

L.Ed.2d 732 (1984).

"A law enforcement official's liability under 42 U.S.C. § 1983 for a violation of an

individual's constitutional rights through the use of excessive force in completing an arrest is well

established." Bauer v. Norris, 713 F.2d 408 (8th Cir. 1983), citing Herrera v. Valentine, 653 F.2d

1220, 1229 (8th Cir. 1981); Putman v. Gerloff, 639 F.2d 415, 420 (8th Cir. 1981).

Although the police may use force to make an arrest, the police may not cross the line and

use excessive force.  In Putnam, the Eighth Circuit cited the Johnson factors[3] as a guide to determine

whether force was excessive:

> In determining whether the constitutional line has been crossed, a court must look to
> such factors as the need for the application of force, the relationship between the need
> and the amount of force that was used, the extent of the injury inflicted, and whether
> force was applied in a good faith effort to maintain or restore discipline or
> maliciously and sadistically for the very purpose of causing harm.

Putnam v. Gerloff, 639 F.2d 415, 420 (8th Cir. 1981), *quoting* Johnson v. Glick, 481 F.2d 1028 (2d

Cir. 1973), **cert denied**, 481 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).  However, the

Supreme Court held that in a Fourth Amendment context, "the reasonableness inquiry in an

excessive force case is an objective one: The question is whether the officer's actions are objectively

reasonable in light of the facts and circumstances confronting them, without regard to their

---

[3] The Johnson factors were adopted from the case of Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973), **cert denied**, 414
U.S. 1033, 94 S.Ct. 462 38 L.Ed.2d 324 (1973).

underlying intent and motivation." Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d

443 (1989).  In Graham, the Supreme Court overruled the district court's granting of summary

judgment because the trial judge held the plaintiffs failed to show that the officers acted with malice

and sadism, which are unnecessary elements.   Whether a police officer can use force will be

determined by the circumstances.   "[I]ts proper application requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." Kuha v. City of Minnetonka, 365 F.3d 590,

597 (8th Cir. 2003), citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443

(1989).

"Force can only be used to overcome physical resistance or threatened force . . . ." Bauer v.

Norris, 713 F.2d 408 (8th Cir. 1983), citing Agee v. Hickman, 490 F.2d 210, 212 (8th Cir. 1974),

**cert denied** 417 U.S. 972, 94 S.Ct. 3178, 41 L.E.2d 1143 (1974).  The Eighth Circuit in *Bauer* also

cited the case of Feemster v. Dehntjer, 661 F.2d 87 (8th Cir. 1981), which stands for the proposition

that if a person quietly submits to an arrest, then the officers may not use any type of force to effect

the arrest.  In another case, the Eighth Circuit held that where there is no provocation, any force used

by the police to effect an arrest is excessive, even if the plaintiff's injuries are minor.  United States

v. Harrison 671 F.2d 1159, 1162 (8th Cir. 1982).  "[T]he alleged use of excessive force is generally

an issue of fact." Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985)

It was pointed out in *Bauer* that the plaintiffs were arrested for misdemeanor disorderly

conduct.  The Court also pointed out that at the time Deputy Norris encountered the Bauers, they

were not engaged in any unlawful conduct. 713 F.2d at 412.   In *Bauer*, the Eighth Circuit affirmed

the jury's award of $14,000.00 to Mr. & Mrs. Bauers holding that in light of the circumstances, the officer was not justified in using **any** force, despite the fact that Mr. Bauer only received slight bruising to his wrists as a result of being handcuffed too tightly.

> Assuming liability is found under section 1983 the jury may assess compensatory damages based upon, **inter alia**, the physical harm suffered (including pain and discomfort), the emotional harm suffered (including fear, humiliation and mental anguish) even though no actual damages are proven, and the violation of plaintiffs' substantive right to liberty.

Bauer v. Norris, 713 F.2d 408, 413 (8th Cir. 1983), citing Herrera v. Valentine, 653 F.2d 1220, 1227-31 (8th Cir. 1981;  Guzman v. Western State Bank, 540 F.2d 948, 953 (8th Cir. 1976).  The Eighth Circuit in *Bauer* went on to state that "[a] jury may award more than a nominal sum for the deprivation of certain substantive constitutional rights, including the due process and liberty interests in freedom from excessive force at the hands of police officers, independent of any recovery for actual physical and emotional injury." 713 F.2d at 413-414.

TASER

The issue in the case at bar is whether jailers can use a Taser on an inmate, who poses no threat, and for simply failing to obey a command?  The answer is a resounding "no."

> The X26 uses compressed nitrogen to propel a pair of 'probes' – aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires–toward the target at a rate of over 160 feet per second.  Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles[4].  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. *See Draper v. Reynolds*, 369 F.3d 1270, 1273, n. 3 (11th Cir. 2004); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993).  The tasered person also experiences an excruciating pain that radiates throughout the body. *See Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) ('[O]ne need not have personally endured a taser jolt to know the pain that must accompany it . . . .');

---

[4]The Court in *Bryan v. McPherson*, n. 4, noted that technically the Taxer X26 delivers a 50,000 volt.

*Hickey*, 12 F.3d at 757.

<u>Bryan v. McPherson</u>, 590 F.3d 767, 773 (9th Cir. 2009).

In the case of *Bryan v. McPherson*, supra., Carl Bryan, at the time twenty-one (21) years old, was pulled over by Officer Brian McPherson, of the Coronado Police Department, in California. Carl Bryan, had just been pulled over by a California Highway Patrol Officer for speeding, prior to being pulled over by Officer McPherson. Bryan was angry about being pulled over by the California Highway Patrol, and was really angry when he was later stopped, a few minutes later by Officer McPherson. Officer McPherson and other members of the Coronado Police Department were running a check point, checking people for not wearing seatbelts. When Carl was pulled over, he got out of his vehicle, and was cursing at himself, and striking his thigh. While Carl was standing on the street, and without warning, Officer McPherson tasered Carl, which rendered him incapacitated. Carl fell to the ground, face first, breaking several teeth, and receiving abrasions to his face. At the time that Carl was tased, he was some 15 to 20 feet from Officer McPherson. Officer McPherson contends that the reason he tased Carl, was due to the fact that he took a step towards the officer, and that Carl was acting aggressive, due to his use of profanity. The Court noted that just one of the taser probes embedded in the upper left arm of Bryan, which rendered him incapacitated, causing him to fall.

The Court found that Officer McPherson subjected Bryan to excessive force, violating his Fourth Amendment Right to the United States Constitution.

We, along with our sister circuits, have held that tasers and stun guns fall into the category of non-lethal force. *See, e.g., Lewis*, 581 F.3d at 476; *United States v. Fore*, 507 F.3d 412, 413 (6th Cir. 2007); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n. 8 (9th Cir. 2005). Non-lethal, however, is not synonymous with non-excessive; all force—lethal and non-lethal–must be

> justified by the need for the specific level of force employed. *Graham*, 490 U.S. at
> 395, 109 S.Ct. 1865; *see also Deorle*, 272 F.3d at 1285 ('Less than deadly force, like
> deadly force, may not be used without sufficient reason; rather, it is subject to the
> Graham balancing test.') Nor is 'non-lethal' a monolithic category of force.  A blast
> of pepper spray and blows from a baton are not necessarily constitutionally
> equivalent levels of force simply because both are classified as non-lethal.

Bryan v. McPherson, 590 F.3d 767, 773-74 (9th Cir. 2009).

"The physiological effects, the high levels of pain, and foreseeable risk of physical injury lead us to

conclude that the X26 and similar devices are a greater intrusion than other non-lethal methods of

force we have confronted."  590 F.3d at 774.

The defendants will obviously argue that Mr. Smith was not injured as a result of the

tasering, or that his injuries were minimal. Although Mr. Smith did not seek medical attention upon

his release, after being tased, he was in fact injured.  As a result of being tased, Mr. Smith suffered

injuries to his elbow, due to falling.  Mr. Smith has permanent scarring on his chest, due to the  taser

burns.  (**Smith's depo., pp. 35-36**).  As the Ninth Circuit pointed out in *McPherson*, supra.:

> We similarly reject any contention that, because the taser results only in the
> 'temporary' infliction of pain, it constitutes a nonintrusive level of force.  The pain
> is intense, is felt throughout the body, and is administered by effectively
> commandeering the victim's muscles and nerves.  Beyond the experience of pain,
> tasers result in 'immobilization, disorientation, loss of balance, and weakness,' *even*
> *after the electrical current has ended. Matt-Ballesteros v. Henman*, 896 F.2d 255,
> 256 n. 2 (7th Cir. 1990); *see also Beaver v. City of Federal Way*, 507 F.Supp.2d 1137,
> 1144 (W.D.Wash. 2007).  ('[A]fter being tased, a suspect may be dazed, disoriented,
> and experience vertigo.').  Moreover, tasering a person may result in serious injuries
> when intense pain and loss of muscle control cause a sudden and uncontrolled fall.

Bryan v. McPherson, 590 F.3d 767, 774 (9th Cir. 2009) (emphasis added).

When a person is tased, the "TASER technology causes incapacitation and strong muscle

contractions making secondary injuries a possibility."  (**See Plaintiff's Exhibit "I", p. 4**).  One of

the possible consequences or effects of being tased is that the person will experience one or many

of the following conditions:

- Subject can fall immediately to the ground and be unable to catch him/herself

- Subject may yell or scream

- Involuntary strong muscle contractions

- Subject may freeze in place with legs locked

- Subject may feel dazed for several seconds/minutes

- Potential vertigo

- Temporary tingling sensation

- May experience critical stress amnesia (may not remember any pain)

**(See Plaintiff's Exhibit "I", p. 5)**.

> The X26 thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes an intense pain and acts upon the target's physiology, the effects of the X26 are not limited to the target's eyes or respiratory system. Unlike the police 'nonchakus' we evaluated in *Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994), the pain delivered by the X26 is far more intense and is not localized, external, gradual, or within the victim's control. *Id* at 807, 805 n. 5. In light of these facts, we agree with the Fourth and Eighth Circuit's characterization of a taser shot was a 'painful and frightening blow.' *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008) (quoting *Hickey*, 12 F.3d at 757). We therefore conclude that tasers like the X26 constitute an 'intermediate or medium, though not insignificant, quantum of force,' *Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1168 (E.D.Cal. 2008); *Beaver*, 507 F.Supp.2d at 1144 ('[T]he Court first finds that the use of a Taser constituted significant force.').

Bryan v. McPherson, 590 F.3d 767, 774 (9th Cir. 2009).

Based on the above, the Court held that "the X26 and similar devices constitute an intermediate, significant level of force that must be justified by 'a strong government interest [that] compels the employment of such force.'" McPherson, 590 F.3d at 774-75, quoting, Drummond ex rel.

Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir. 2003) (*quoting* Deorle, 272 F.3d at

1280 (9th Cir. 2001)).

In a case out of the Eighth Circuit, an inmate at the Pulaski County Jail, refused to sweep his

cell, when he was told to do so.  The guard called for assistance, and approximately five (5) other

guards came to the cell.  The inmate still refused to sweep his cell.  The inmate was threaten with

being tased, if he did no comply with the order.  Again, the inmate refused.  The inmate also threaten

to whip the guard's "ass," if he tried to force him to sweep his cell.  The guard finally shot the inmate

with the stun gun.  When the inmate (J. B. Hickey) regained his composure, he complied by

sweeping his cell.  Hickey filed an Eighth Amendment violation claim against the guards.

In dealing with Eighth Amendment violations, the Court held that "[i]n excessive force cases,

that standard is the unnecessary and wanton infliction of pain." Hickey v. Reeder, 12 F.3d 754, 757

(8th Cir. 1993), *citing*, McMillian, __ U.S. at ___, 112 S.Ct. at 998-99.  The court found that Hickey

did not make any threats to physically assault the officers.  The testimony indicated that Hickey was

threaten with the stun gun, simply because he refused to sweep his cell.  "The stun gun is intended

to temporarily incapacitate a threatening person, and to give the officers involved momentary

advantage and a chance to neutralize the threat." *Hickey*, 12 F.3d at 757.

> The defendants' own testimony reveals that a stun gun inflicts a painful and
> frightening blow, which temporarily paralyzes the large muscles of the body,
> rendering the victim helpless.  This is exactly the sort of torment without marks with
> which the Supreme Court was concerned in *McMillian*, and which, if inflicted
> without legitimate reason, supports the Eighth Amendment's objective component.
> *See Id.* __ U. S. at 112 S.Ct. at 999-1000 (punching, with no significant injury);
> *Jordan v.Gardner*, 986 F.2d 1521, 1523-26 (9th Cir. 1993) (psychological trauma).

12 F.3d at 757.

In the case at bar, Mr. Smith was tased, because he did not get out of his bunk when told to do so.

-24-

The testimony revealed that Choate and Zulpo ordered Mr. Smith to get out of his bunk, so that he could be moved to the front to be observed due to his complaints.  (**Choate's depo., p. 33**).  When Mr. Smith indicated that he could not get out of his bunk due to this injuries, Zulpo told him that if he did not get up, he would be tased.  (**Choate's depo., p. 34**) (**Smith's depo., p. 21**).

The Court found that the use of the stun gun amounted to a "wanton and unnecessary infliction of pain forbidden by the Eighth Amendment." Hickey v. Reeder, 12 F.3d 754, 758 (8th Cir. 1993).

> Whether pain is wantonly and unnecessary inflicted depends, at least in part, on whether force could have plausibly been thought to be necessary to maintain order in the institution and to maintain the safety of the prison personnel or inmates.  *Id*. at 320-21, 106 S.Ct. at 1084-85. Other relevant factors include: the objective need for force; the relationship between the need for force and the force used; the threat to others reasonably perceived by the officers; efforts to temper the severity of the force used; and the extent of pain or injury inflicted. *McMillian*, __ U.S. at __, 112 S.Ct. at 999.  In this case we find that there was no need for physical force to compel Hickey to sweep his cell.  Hickey was not physically threatening the officers, nor was the stun gun applied for that reason.  The relationship between the need for force (zero) and the force used (a painful and incapacitating shock) was excessive.  And the pain inflicted was substantial.

Hickey v. Reeder, 12 F.3d 754, 758 (8th Cir. 1993).

In another case from the Eighth Circuit, the court held that the plaintiff had stated a cause of action for excessive force.  Sandra Brown and her husband went to a restaurant with friends and had some drinks.  Sandra Brown was riding as a passenger.  Police officer conducted a traffic stop on Ms. Brown's husband.  While the officers were tending to Mr. Brown, Sandra Brown was on her cell phone.  An officer came to the passenger side, and ordered Ms. Brown to get off her cell phone.  Ms. Brown was fearful, and did not get off the cell phone.  The officer then applied the TASER to Ms. Brown's right arm, forcibly removed her from the car, and placing her under arrest.  Ms. Brown

brought this excessive force claim. "We analyze excessive force claims in the context of seizures under the Fourth Amendment, applying its reasonable standard." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009), citing Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Brown, 574 F.3d at 496, quoting, Henderson, 439 F.3d at 502 (quoting Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004) and Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994)). "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Brown, 574 F.3d at 496. The Court held that since Sandra Brown was not resisting the officer, and did not pose a threat, nor was she attempting to flee, it was unreasonable for the officer to use any force on her. Brown, 574 F.3d at 497.

In another case, the defendant was not entitled to qualified immunity for tasering an inmate lying on the floor. The inmate was not threatening the officer at the time he was tased. The guard tasered the inmate in the genital area, causing damage to his testicle and hand. The guard contends that the plaintiff was acting erratically. The guard (Pedersen) "contends Mahamed continued to yell, and due to 'Mahamed's level of agitation, Pedersen concluded that using a [t]aser to effectuate control over Mahamed would be safer for all concerned that wrestling with him on the hard concrete floor of the cell." Mahamed v. Anderson, 613 F.3d 1084, 1087 (8th Cir. 2010). The Court held that the defendant was not entitled to qualified immunity. The court further stated that, "[t]he factual controversies pertaining to Mahamed's conduct, Pedersen's response, Pedersen's intent, and

Mahamed's injuries, are the type of issues best left for trial." 613 F.3d at 1087.

Qualified Immunity

The defendant argues that they are entitled to qualified immunity. "To determine whether an official is entitled to qualified immunity, we ask two questions (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right, and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." Henderson v. Munn, 439 F.3d 497, 501-502 (8th Cir. 2006), *citing*, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); Wilson v. Lawrence County, Mo., 260 F.3d 946, 951 (8th Cir. 2001) (*citing* Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001)).

Clearly the constitution protects individuals from cruel and unusual punishment, while incarcerated in detention facilities. The Eighth Amendment protects jail inmates from cruel and unusual punishment. This right has been clearly established for a long time. The defendants have been placed on notice that as early as 1993, jail officials are not to use the Taser, simply because a person refuses to comply with orders. *See* Hickey v. Reeder, 12 F.3d 754, 758 (8th Cir. 1993). Therefore, the defendants are not entitled to qualified immunity.

The defendant argues that since Jansen Choate did not tase the plaintiff, then he cannot be held liable. It is true that Choate did not pull the trigger to tase the plaintiff; however, Choate turned over his Taser to Zulpo, who tased the plaintiff. Choate has a constitutional duty to not allow an officer to abuse an inmate.

-27-

Of course, police officers have a duty to intervene that is enforceable under the Due Process Clause.  For example, '[a]n officer who is present at the same [of an arrest] and who fails to take reasonable steps to protect to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance,' provided that he had a 'realistic opportunity' to prevent the other officer's actions.  *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n. 3 (1st Cir. 1990), *cert. denied*, 500 U.S. 956, 111 S.Ct. 2266, 114 L.E.2d 718 (1991); *accord O'Nell v. Krzeminski*, 839 F.2d 9, 11-12 (2nd Cir. 1988).

Martinez v. Colon, 54 F.3d 980, 985 (1st Cir. 1995).

In another case, the court held that the officer, who was the non-participant, had a duty to intervene.  The non-participating officer just sat by and watched as another officer attacked a youth. The non-participating officer had his weapon drawn on the youth, while the other officer, who was not sued, attached and injured the youth.

The jury instructions given reflected these two alternate grounds for the 'duty to intervene': first, officers may have an affirmative duty to intervene arising from being present at the scene, aware of the use of excessive force by another officer, and able to stop it; and second, '[a] constitutional duty to intervene may also arise if the onlooker officer is instrumental in assisting the actual attacker or aggressor to place the victim in a vulnerable position.' O'Neill's arguments fail under both theories.

Torres-Rivera v. O'Neil-Cancel, 406 F.3d 43, 51-52 (1st Cir. 2005).

Officer Choate was a joint participant in the tasering of Mr. Smith.  Officer Choate handed his Taser to Officer Zulpo.  Officer Choate could have easily said "no, there is no need to tase Mr. Smith."

That conclusion is even clearer under the second theory–that O'Neill was a participant and enabler of the attack.  The joint participant basis for liability is well established in the section 1983 case law.  *See Martinez*, 54 F.3d at 985 n. 4.  ('A constitutional duty to intervene may also arise if onlooker officers are instrumental in assisting the actual attacker to place the victim in a vulnerable position.   In such a scenario, the onlooker officers and the aggressor officer are essentially joint tortfeasors and, therefore, may incur shared constitutional responsibility.' (citations omitted)).  A 'shock the conscience' instruction would not be appropriate for this theory of joint participation.

-28-

Torres-Rivera v. O'Neil-Cancel, 406 F.3d 43, 51-52 (1st Cir. 2005).

    Policy of Tasering

Choate and Jansen state that they tasered the plaintiff because he refused to comply with their orders to get up and come with them to the front.  Both Choate and Jansen state that Rick Emerson approved of their use of the Taser to get an inmate to comply.  (**Choate's depo., p. 10**).  In an incident involving Jacob Battle, who was an inmate at the Conway County Jail, Jansen tasered Mr. Battle, who had previously slapped Mr. Jansen, who at the time was not armed with his Taser. (**Choate's depo., p. 14**).  Mr. Jansen had referred to Mr. Battle as a "bitch," when complaining about his head hurting. (**Choate's depo., p. 13**).  It was obvious that Mr. Choate provoked Mr. Battle, which led to him being tased by Choate.  (**Choate's depo., p. 16**).  Mr. Choate told Emerson about the matter, and he gave his seal of approval. (**Choate's depo., pp. 20-21**).  The Conway County jail had posters put up in the jail that warned the inmates that if they refuse to obey an order, they would be tased.  This was the policy of the Conway County Jail, and it was this policy that led to Mr. Smith constitutional deprivation.

In conclusion the plaintiff has presented sufficient evidence that he was subjected to cruel and unusual punishment while incarcerated at the Conway County Jail.  The defendants were well aware that tasering an individual for simply not being able to get out of the bed was clearly in contravention of the United States Constitution.  The defendants has a policy of allowing its officers to tase individuals for simply not complying with an officers order.  Certainly the federal courts cannot condone such constitutional deprivations.

Respectfully submitted,

**/s/ Austin Porter Jr.**
Bar Number 86145
PORTER LAW FIRM
The Tower Building
323 Center Street, Suite 1300
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
E-mail: Aporte5640@aol.com

<u>CERTIFICATE OF SERVICE</u>

   I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas - Western Division, on the 6th day of September 2013 using the CM/ECF system, which is designed to send notification of such filing to the following:

  Jason E. Owens
  Geoff Thompson
  RAINWATER, HOLT & SEXTON, P.A.
  P. O. Box 17250
  6315 Ranch Drive
  Little Rock, Arkansas 72222-7250

  www.owens@rainfirm.com
  www.thompson@rainfirm.com

       **/s/Austin Porter Jr.**

-30-